SLIP OPINION



# SUPREME COURT OF ARKANSAS

No. CR-12-1130

| | |
|---|---|
| CHARLES WILLIAMSON<br>APPELLANT | **Opinion Delivered** September 26, 2013 |
| V. | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. CR2010-244-I] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE JOHN HOMER WRIGHT, JUDGE |
| | <u>AFFIRMED</u>. |

**CLIFF HOOFMAN, Associate Justice**

Appellant Charles Williamson appeals from his conviction for first-degree murder, for which he received a life sentence. He was also convicted of using a firearm during the commission of the felony and received a sentence enhancement of fifteen years' imprisonment. On appeal, Williamson argues (1) that there was insufficient evidence to support his conviction and (2) that the circuit court erred in denying his motion to suppress his confession. Our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2) (2013). We affirm.

Williamson was charged with first-degree murder in connection with the death of his girlfriend, Jessica Noles, on April 23, 2010, in Hot Springs, Arkansas. According to Williamson, who confessed to police and also testified at the jury trial, he and Noles were in an argument, and Noles threatened to leave Williamson and take the couple's two-week-old son with her. Williamson went and retrieved his .38 Special revolver, which he had purchased the previous month. Noles was sitting in the kitchen, holding their son, and

Williamson testified that he pointed the gun at Noles's forehead, cocked the hammer back, and pulled the trigger, killing her. He testified that he "blacked out," that he was not in his right mind at the time, and that he could not control his actions. Williamson stated that he caught the baby as Noles slumped over in the chair. He then threw the gun in the trash can and called his grandmother, who called 911.

Detective Michael Lyndon with the Hot Springs Police Department testified that he arrived on the scene at 2:45 p.m. When he entered the apartment, Lyndon stated that he saw Noles's body slumped over in the chair with an obvious gunshot wound to the head, from which blood was dripping into either a bucket or a trash can. Williamson was holding the baby and talking on the phone, and Lyndon heard Williamson say to the person on the phone that "he didn't mean to hurt her." Williamson's grandmother and his aunt were also present in the apartment. Lyndon asked about the location of the weapon, and Williamson advised police that it was in the trash can. The gun was retrieved and contained four live cartridges. One spent .38-caliber shell casing was also recovered.

Williamson was arrested and taken to the police station for questioning, and Sergeant Jason Brasfield conducted the interview. Brasfield testified that he first advised Williamson of his *Miranda* rights. According to Brasfield, Williamson told him that he had completed the twelfth grade through a special-education program and that he was not currently under the influence of any alcohol or drugs. Brasfield testified that he then showed Williamson the rights form and read each right to him, while allowing Williamson to read along. Brasfield asked Williamson if he understood each right, which he indicated that he did by placing his

initials beside each one. Brasfield also read aloud the waiver-and-consent section of the form, and both Williamson and Brasfield signed it. Brasfield testified that Williamson did not have any questions about his rights and that he did not appear to have any trouble understanding the form. After Williamson had waived his rights, he gave a statement to Brasfield in which he admitted shooting Noles during their argument. He claimed that he suffered from obsessive-compulsive disorder (OCD) and that this triggered his bipolar condition, causing him to become angry and to shoot Noles after she threatened to leave him. Williamson indicated that he and Noles had been arguing all week because Noles's mother had been telling her that he was "no good" and that she should leave him. After Williamson finished his statement, Brasfield went and typed it up, then brought it to him to review and sign. Brasfield testified that he read the statement to Williamson and allowed him to read along. Williamson did not indicate that there were any changes or corrections that needed to be made to the statement. Brasfield brought another officer along to witness the statement being read to Williamson, and both officers, as well as Williamson, signed the statement.

Prior to trial, Williamson filed a motion to suppress his statement to police, arguing that he was not properly advised of his *Miranda* rights and that he lacked the mental capacity to consent to a waiver of his rights. After a hearing, the circuit court denied the motion, finding that Williamson had been adequately apprised of his *Miranda* rights, that he had waived those rights, and that he had voluntarily given his statement to police.

In addition to Williamson's confession, the State presented evidence that Noles was killed by a single bullet fired from Williamson's .38 Special at a distance of less than one inch.

The firearm and tool-mark examiner testified that the gun was a double-action/single-action revolver, which could be fired either by first cocking the hammer back and then pulling the trigger, which requires relatively little trigger pressure, or by not cocking the hammer but by exerting significantly more pressure on the trigger.

At the conclusion of the evidence, the jury was given instructions on the charged offense of first-degree murder, the lesser-included offense of second-degree murder, and the firearm enhancement. The jury convicted Williamson of first-degree murder, as well as the firearm enhancement, and sentenced him to life in prison, plus fifteen years. Williamson filed a timely notice of appeal from the judgment and commitment order entered on July 19, 2012.

In his first point on appeal, Williamson argues that there was insufficient evidence to support his first-degree murder conviction. In determining whether there is substantial evidence to support the verdict, this court reviews the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Wyles v. State*, 368 Ark. 646, 249 S.W.3d 782 (2007). Substantial evidence is that evidence which is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* The fact that evidence is circumstantial does not render it insubstantial; however, when circumstantial evidence is relied upon, it must exclude every other reasonable hypothesis but the guilt of the accused. *Id.* The question of whether circumstantial evidence excludes other reasonable hypotheses is for the jury to decide. *Id.* When reviewing a sufficiency challenge, this court reviews all of the supporting evidence introduced at trial, even if it was admitted erroneously. *Dodson v. State*, 341 Ark. 41, 14 S.W.3d 489 (2000).

4

Williamson contends that the State failed to offer substantial evidence of his intent to commit first-degree murder because it did not prove that it was his conscious object to cause the death of Jessica Noles. The statute pursuant to which Williamson was convicted, Ark. Code Ann. § 5-10-102(a)(2) (Repl. 2006), required the State to show that Williamson, with the purpose of causing the death of another person, caused the death of another person. A person acts purposely with respect to his or her conduct when he or she acts with the conscious object to engage in conduct of that nature or to cause the result thereof. Ark. Code Ann. § 5-2-202(1) (Repl. 2006). Intent or state of mind is rarely capable of proof by direct evidence, but must usually be inferred from the circumstances surrounding the offense. *Wyles*, *supra*. One is presumed to intend the natural and probable consequences of his actions. *Id*. The circumstances from which intent may be inferred include the type of weapon, the manner in which it was used, and the nature, extent, and location of the trauma suffered by the victim. *Id*. In addition, the jury is responsible for resolving questions of conflicting testimony and may choose to believe the State's account of the facts, rather than the defendant's. *Id*.

The evidence presented by the State in this case showed that Williamson and Noles were in an argument, that he went to retrieve his revolver, and that he then placed the gun less than one inch away from her head and pulled the trigger, killing her. The State's firearm expert testified that the revolver could be fired by two different methods: by first cocking the hammer back, then pulling the trigger with minimal pressure, or by simply pulling the trigger but with a much greater amount of pressure. Williamson testified at trial that he remembered

5

first cocking the hammer and then pulling the trigger. Given these circumstances, there was substantial evidence from which the jury could have inferred that it was Williamson's conscious object to cause Noles's death. *See Thompson v. State*, 338 Ark. 564, 999 S.W.2d 192 (1999) (stating that when one puts a .38-caliber pistol directly against another person's neck and fires the gun, the natural and probable consequence of that act is the death of the victim); *Walker v. State*, 324 Ark. 106, 918 S.W.2d 172 (1996) (gunshot fired at close range to victim's head after victim confronted defendant constituted substantial evidence of defendant's purposeful intent). While Williamson testified that he had "blacked out" and did not have control of his actions due to his alleged mental disabilities, the jury was entitled to disbelieve this self-serving testimony. *Wyles*, *supra*. This is especially true given that Williamson apparently regained control of his actions in time to catch his infant son as he fell out of Noles's arms immediately after she had been shot. We affirm on this point.

In his second point on appeal, Williamson argues that the circuit court clearly erred by denying his motion to suppress his statement to police. This court reviews a trial court's decision denying a defendant's motion to suppress a confession by making an independent determination based on the totality of the circumstances, and the ruling will be reversed only if it is clearly against the preponderance of the evidence. *Osburn v. State*, 2009 Ark. 390, 326 S.W.3d 771. Conflicts in testimony at a suppression hearing about the circumstances surrounding a defendant's in-custody statement are for the trial judge to resolve. *Id*.

Custodial statements are presumed to be involuntary, and the burden is on the State to prove that the statement was given voluntarily and was knowingly and intelligently made.

*Id.* In determining whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, we look to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* In making this determination, we consider the following factors: age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of detention; the repeated or prolonged nature of the questioning; the use of physical or mental punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.*

Williamson argues that his statement was not given voluntarily, knowingly, and intelligently because he was only twenty-two years old, he had completed twelfth grade in a special-education program, he had difficulty reading, and he had a learning disability. He further asserts that he was taken directly to the police station from the crime scene without the opportunity to receive advice from anyone other than the police about his constitutional rights. Williamson admits that there was no prolonged period of questioning in this case and that there was no use of mental or physical punishment.

Despite Williamson's assertions that his age, education, intelligence, and vulnerability prevented his statement from being voluntary, Sergeant Brasfield testified at the suppression hearing that he asked Williamson if he could read, write, and understand English. He also confirmed that Williamson had completed high school. Brasfield testified that he then read each line of the rights form to Williamson, while allowing him to read along at the same time, and that Williamson did not ask any questions about his constitutional rights. Brasfield stated that Williamson did not appear to have any trouble understanding the form and that he

SLIP OPINION

initialed each constitutional right as it was read to him to indicate that he understood each one. Brasfield then read the waiver and consent provision at the bottom of the form to Williamson, who signed it and agreed to give a statement. After Williamson gave his statement, Brasfield typed it up and then read it to Williamson, ensuring that he did not wish to make any corrections or changes. Another officer who witnessed Brasfield read the statement to Williamson also testified that Williamson adopted it and that he did not appear to have any trouble comprehending the situation.

Although Williamson testified that he did not remember Brasfield reading the rights form to him, that he could not really read or write, and that he told Brasfield that he had difficulty reading, conflicts in testimony at the suppression hearing are for the circuit court to determine. *Osburn*, *supra*. Furthermore, even though Williamson professed at the hearing to not understand the right to remain silent or the role of his counsel, he admitted on cross-examination that he had undergone two mental examinations in which he had correctly identified the parties in a court proceeding. Given these circumstances, the circuit court did not clearly err in finding that Williamson was adequately apprised of his constitutional rights and that he voluntarily waived those rights by giving a statement.

Williamson also argues that his statement was involuntary because it was induced by a false promise, due to his testimony at the suppression hearing that Sergeant Brasfield promised him that he could go home if he told the police what had happened. We have held that if a police official makes a false promise that misleads a prisoner, and the prisoner gives

SLIP OPINION

a confession because of that false promise, then the confession has not been voluntarily, knowingly, and intelligently made. *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998).

The State responds that Williamson's argument regarding the alleged false promise is not preserved for appellate review because Williamson did not raise it to the circuit court. We agree. The only issues raised in Williamson's motion to suppress were whether he was properly advised of his *Miranda* rights and whether he lacked the mental capacity to consent to a waiver of his rights. Williamson never made a false-promise argument either in his motion to suppress or at the suppression hearing. Accordingly, this particular argument is not preserved for our review. *See, e.g.*, *Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007) (holding that an argument not raised to the circuit court in a motion to suppress is not preserved for appeal, even if it is constitutional in nature). We therefore affirm the circuit court's denial of Williamson's motion to suppress.

*Rule 4-3(i) Review*

In compliance with Ark. Sup. Ct. R. 4-3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Williamson, and no prejudicial error has been found.

Affirmed.

*Rosalyn A. Watts, P.A.*, by: *Rosalyn A. Watts*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Christian Harris*, Ass't Att'y Gen., for appellee.